In Re:

     PCL Group, LLC

_____

Monadnock Community Bank, )
Movant )

Vs.

PCL Group, LLC Respondent )

_____

BK.: 11-11008-JMD
Chapter 7

## **MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

NOW COMES, the Petitioner, Monadnock Community Bank, by and through its attorneys, the Law Office of Steve J. Bonnette, P.C., and moves that it be granted relief from the automatic stay. In support of this Motion, the Movant states the following:

1.     This is a contested matter brought under 11 U.S.C. Section 362(d) and Bankruptcy Rule 4001(a).

2.     This Court has jurisdiction pursuant to 28 U.S.C. Section 1334.

3.     This Motion is a core proceeding as defined in 28 U.S.C. Section 157(b)(G).

4.     The Movant, Monadnock Community Bank is a banking institution with an address of P.O. Box 888, Peterborough, NH 03458.

5.     The Respondent, PCL Group, LLC filed a Chapter 7 Bankruptcy case with this Court on March 18, 2011.

**DEBT**

### LOAN #3320885

6.     That on August 19, 2009, the Respondent executed and delivered to the

Movant an SBA Note in the principal amount of $750,000.00 with an adjustable interest rate. A copy of the Note is attached hereto as Exhibit A.

7. The loan was in default and the Movant sent all required demands including taking possession of the collateral that secured the loan. A public auction of the collateral was set to commence approximately three days before the bankruptcy was filed.

8. As of March 22, 2011, the outstanding balance on the debt was $631,315.94. This is comprised of an outstanding principal balance of $593,141.86, accrued interest of $12,034.04, late charges of $8,190.42, and collection charges of $17,949.62. Interest continues to accrue at $93.44 per day as well as additional collection charges.

<u>LOAN #3320934</u>

9. That on August 19, 2009, the Respondent executed and delivered to the Movant a Note in the principal amount of $200,000.00 with an adjustable interest rate. A copy of the Note is attached hereto as Exhibit B.

10. The loan was in default and the Movant sent all required demands including taking possession of the collateral that secured the loan. A public auction of the collateral was set to commence approximately three days before the bankruptcy was filed.

11. As of March 22, 2011, the outstanding balance on the debt was $208,373.07. This is comprised of an outstanding principal balance of $198,943.86, accrued interest of $8,728.25, and late charges of $700.96. Interest continues to accrue at $31.34 per day as well as additional collection charges.

<u>LOAN #3342061</u>

12.     That on March 31, 2010, the Respondent executed and delivered to the Movant a Note in the principal amount of $50,000.00 with an interest rate at 8% per annum.  A copy of the Note is attached hereto as Exhibit C.

13.     The loan was in default and the Movant sent all required demands.

14.     As of March 22, 2011, the outstanding balance on the debt was $52,518.75.  This is comprised of an outstanding principal balance of $49,945.24, and accrued interest of $2,573.51.  Interest continues to accrue at $10.95 per day as well as additional collection charges.

15.     As set forth above the total amount due to Movant by Respondent as of March 22, 2011 is $892,207.76.

**SECURITY INTEREST**

16.     To secure loan #3320885, the Respondent granted the Movant a lien on its assets pursuant to a Security Agreement dated August 19, 2009.  A copy of the Security Agreement is attached hereto as Exhibit D.  A copy of the recorded UCC financing statement is attached hereto as Exhibit E.

17.     To secure loan #3320934, the Respondent granted the Movant a lien on its assets pursuant to a Security Agreement dated August 19, 2009.  A copy of the Security Agreement is attached hereto as Exhibit F.  A copy of the recorded UCC financing statement is attached hereto as Exhibit G.

**OTHER LIENS**

18.     Upon information and belief, there are no other liens.

**VALUE**

19.     The Movant has current valuations of the Respondent's assets at $98,500.00

**RELIEF REQUESTED**

20. The Movant requests relief from the automatic stay as the Respondent does not have any equity in its assets and the assets are not necessary to an effective reorganization as this is a Chapter 7 case.

21. Since there is no equity in the property, the Respondent cannot provide adequate protection to the Movant.

22. In the Respondent's Statement of Intention filed with this Court, the Respondent states that the subject property will be surrendered to the Movant.

WHEREFORE, the Movant respectfully requests that this Honorable Court enter an Order which:

A. Grants the Movant stay relief as to the Respondent's property, as set forth in Movant's Security Agreements and UCC Financing Statements to allow Movant to exercise its stay law rights;

B. Grants such other and further relief as it deems fair and equitable.

Respectfully submitted,
Monadnock Community Bank
By its Attorneys,

Dated: March 28, 2011

Steve J. Bonnette, Esquire
20 Central Square, Suite 2A
Keene, NH 03431
(603) 355-2900
Email: sbonnette@bonnettelaw.com



U.S. Small Business Administration

# NOTE

| SBA Loan # | 35357150-03 |
|---|---|
| SBA Loan Name | The PCL Group, LLC |
| Date | 08/19/2009 |
| Loan Amount | 750,000.00 |
| Interest Rate | 5 75 for 14 months, then WSJP plus 2.5%, adjusting quarterly thereafter |
| Borrower | The PCL Group, LLC |
| Operating Company | The PCL Group, LLC |
| Lender | Monadnock Community Bank |

## 1  PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

Seven Hundred Fifty Thousand _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

## 2.  DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

## 3. PAYMENT TERMS.

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

Repayment Terms: Lender must insert onto SBA Note, Form 147, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing:

The initial interest rate is 5.75% per year for 14 Months. This initial rate is the prime rate in effect on the first business day of the month in which SBA received the loan application, plus 2.50%. The interest rate on this Note will then begin to fluctuate as described below. The initial interest rate must remain in effect until the first change period begins.

Borrower must pay a total of 2 payments of interest only on the disbursed principal balance beginning one month from the month this Note is dated and every month thereafter; payments must be made on the first calendar day in the months they are due.

Borrower must pay principal and interest payments of $10,867.88 every month, beginning three months from the month this Note is dated; payments must be made on the first calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted quarterly (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.50% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.Give Lender written notice;

b.Pay all accrued interest; and

c.If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 7 years and 2 months from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;
B. Defaults on any other loan with Lender;
C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G. Fails to pay any taxes when due;
H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I. Has a receiver or liquidator appointed for any part of their business or property;
J. Makes an assignment for the benefit of creditors;
K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;
B. Collect all amounts owing from any Borrower or Guarantor;
C. File suit and obtain judgment;
D. Take possession of any Collateral; or
E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C. Release anyone obligated to pay this Note;
D. Compromise, release, renew, extend or substitute any of the Collateral; and
E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

Wolters Kluwer Financial Services, St. Cloud, MN

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

Wolters Kluwer Financial Services, St. Cloud, MN

SBA Set-off Language

Set-Off  I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.
  "Right to receive money from you" means:
(1). any deposit account balance I have with you,
(2)r any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3). any repurchase agreement or other nondeposit obligation.
"Any amount due and payable under this note" means the total amount of which
you are entitled to demand payment under the terms of this note at the time you set off.  This total includes any balance the due date
for which you properly accelerate under this note.

  If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply
to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement.  Your right of set-off
does not apply to an account or other obligation where my rights are only as a representative.  It also does not apply to any Individual
Retirement Account or other tax-deferred retirement account.

  You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my
accounts.  I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

11 BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

The PCL Group, LLC

_____     06/19/2009
Steven L Lawrence, Managing member

_____     _____

_____     _____

Witness only

| | | |
|---|---|---|
| The PCI Group, LLC<br>375 Jaffrey Road<br>Peterborough, NH 03458 | Monadnock Community Bank<br>1 Jaffrey Road<br>P.O. Box 888<br>Peterborough, NH 03458 | Loan Number 3320834<br>Date 08-19-2009<br>Maturity Date 08-01-2014<br>Loan Amount $ 200,000.00<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of two hundred thousand and no/100 _____
_____ Dollars $ 200,000.00 _____

☐ **Single Advance:** I will receive all of this principal sum on _____. No additional advances are contemplated under this note.

☒ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On 08-19-2009 _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.

**Conditions:** The conditions for future advances are Interest payments are current and all requested financial information is provided and satisfactory to the bank

☒ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to all other conditions and expires on 08-01-2014

☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 08-19-2009 _____ at the rate of _____ 5.750 %
per year until 11-01-2009 _____.

☒ **Variable Rate:** This rate may then change as stated below.

    ☒ **Index Rate:** The future rate will be 2.500 percent above _____ the following index rate: the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks known as the Wall Street Journal U.S. Prime Rate.

    ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.

    ☒ **Frequency and Timing:** The rate on this note may change as often as every 3rd month beginning 11-01-2009 _____
    A change in the interest rate will take effect On the same day

    ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than _____ %. The rate may not change more than _____ % each _____

**Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
☒ The amount of each scheduled payment will change.     ☒ The amount of the final payment will change.

**ACCRUAL METHOD:** Interest will be calculated on a Actual/365 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
☐ at a rate equal to _____

☒ **LATE CHARGE:** If a payment is made more than 10 _____ days after it is due, I agree to pay a late charge of 5.000% of the late amount _____

☒ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☒ are ☐ are not included in the principal amount above See 399-B Disclosure _____

**PAYMENTS:** I agree to pay this note as follows

Monthly payments of accrued interest calculated on the amount of credit outstanding beginning on 09-01-2009 and principal due on 08-01-2014. This is a variable rate loan and the payment amounts may change. The final payment may also change.

# Revised

**Unpaid Interest:** If checked, then any accrued interest not paid when due will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this agreement.

**ADDITIONAL TERMS:**
Borrower may prepay this note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, borrower must: A: Give the lender written notice; B:Pay all accrued interest; and C: If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, last any interest accrued during the 21 days and paid under subparagraph b., above.
If Borrower does not prepay within thirty (30) days from the date Lender receives the notice, Borrower must give Lender a new notice.
All remaining principal and accrued interest is due and payable six (6) years and one month from the date of the Note. 50% SBA Guarantee. SBA Loan Number 36396750-01

| | |
|---|---|
| ☒ **SECURITY:** This note is separately secured by (describe separate document by type and date).<br><br>Security Agreement, Guarantees and UCC Filing of Even Date | **PURPOSE:** The purpose of this loan is Working Capital _____<br><br>**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2). I have received a copy on today's date**<br>The PCI Group, LLC |
| (This section is for your information and failure to fill in variable security or current agreement will not accord the note.) | _____<br>Steven L. Lawrence, Managing Member |
| Signature for Lender | _____ |
| William C. Gilson, Vice President | _____ |

**DEFINITIONS:** As used on page 1, "X" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note together (referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of New Hampshire will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay, and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make single advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:

(1) any deposit account balance I have with you;

(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and

(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).

(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.

(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.

(4) You may refuse to make advances to me or allow purchases on credit by me.

(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:

(1) demand payment of amounts due (presentment);

(2) obtain official certification of nonpayment (protest); or

(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

EXHIBIT C

| | | |
|---|---|---|
| The PCL Group, LLC<br>375 Jaffrey Road<br>Peterborough, NH 03458 | Monadnock Community Bank<br>1 Jaffrey Road<br>P.O. Box 888<br>Peterborough, NH 03458 | Loan Number 3342061<br>Date 03-31-2010<br>Maturity Date 04-30-2010<br>Loan Amount $ 50,000.00<br>Renewal Of |

**BORROWER'S NAME AND ADDRESS**
"I" includes each borrower above, jointly and severally.

**LENDER'S NAME AND ADDRESS**
"You" means the lender, its successors and assigns.

or value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of fifty thousand and no/100 _____ Dollars $ 50,000.00 _____

☒ **Single Advance:** I will receive all of this principal sum on 03-31-2010 _____. No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____ I will receive the amount of $ _____ and future principal advances are contemplated.
   **Conditions:** The conditions for future advances are _____

   ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to all other conditions and expires on _____ .
   ☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 03-31-2010 _____ at the rate of 8.000 % per year until 04-30-2010 .

☐ **Variable Rate:** This rate may then change as stated below.
   ☐ **Index Rate:** The future rate will be _____ the following index rate: _____

   ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
   ☐ **Frequency and Timing:** The rate on this note may change as often as _____ .
      A change in the interest rate will take effect _____ .
   ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than _____ %. The rate may not change more than _____ % each _____ .
   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   ☐ The amount of each scheduled payment will change.       ☐ The amount of the final payment will change.
   ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a Actual/365 _____ basis.
**POST MATURITY RATE:** I agree to pay interest on the unpaid principal balance of this note owing after maturity, and until paid in full, as stated below:
   ☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).
   ☒ at a rate equal to 18% .
☒ **LATE CHARGE:** If a payment is made more than 10 days after it is due, I agree to pay a late charge of 6.000% of the late amount

☒ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☒ are ☐ are not included in the principal amount above: See 399-B Disclosure

**PAYMENTS:** I agree to pay this note as follows:
1 payment of $50,328.77 on 04-30-2010.

☐ **Unpaid Interest:** If checked, then any accrued interest not paid when due will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this agreement.
**ADDITIONAL TERMS:**
Should Monadnock Community Bank declare this loan to be in default, Monadnock Community Bank shall have the right to charge a default rate of 18% per annum, until such time as the default is cured.

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date):
Unsecured

(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

Signature for Lender


William C. Gilson, Vice President

**PURPOSE:** The purpose of this loan is Short Term Working Capital

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2).** I have received a copy on today's date.
The PCL Group, LLC

_Steven L. Lawrence_
Steven L. Lawrence, Managing Member


**UNIVERSAL NOTE**
Experta ©1984, 1991, Bankers Systems, Inc., St. Cloud, MN Form UN-NH 3/7/2002

**DEFINITIONS:** As used on page 1, "I" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of New Hampshire will govern this note. Any term of this note which is contrary to applicable law will be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full unless, when I make the prepayment, you and I agree in writing to the contrary.

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. You and I may provide this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else, who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

Express © 1984, 1991, Bankers Systems, Inc., St. Cloud, MN Form UN-NH 3/7/2002

# SECURITY AGREEMENT

SECURITY AGREEMENT dated as of this 19th day of August, 2009, by and between **THE PCL GROUP, LLC**, a New Hampshire limited liability company, with a mailing address of 375 Jaffrey Road, Peterborough, New Hampshire (the "Debtor"), and **MONADNOCK COMMUNITY BANK**, a banking corporation organized and existing under the laws of the United States of America, with its principal office at One Jaffrey Road, PO Box 888, Peterborough, New Hampshire, or its successors and assigns (the "Secured Party").

## WITNESSETH:

WHEREAS, incident to a certain Promissory Note from the Debtor in favor of Secured Party in the initial principal amount of $750,000.00 ("Note"), the Secured Party may make loans and financial accommodations to Borrower (collectively, the "Loan"), all as set forth in the Loan Agreement; and

WHEREAS, the obligations of the Secured Party to make the Loan to Borrower are subject to the condition, among others, that the Debtor shall execute and deliver this Agreement and grant the security interests hereinafter described;

NOW, THEREFORE, in consideration of the willingness of the Secured Party to make the Loan to the Debtor and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Security Interest. As security for the Secured Obligations described in Section 2 hereof, the Debtor hereby grants to the Secured Party a security interest in and lien on all of the property described below, as such terms may be defined pursuant to Revised Article 9 of the Uniform Commercial Code ("UCC"), as revised pursuant to the 2000 Official Text of the UCC, as enacted in the State of New Hampshire (hereinafter referred to collectively as the "Collateral"):

(a)     All goods, including, but not limited to, machinery, equipment, furniture, appliances, fixtures, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, along with all other parts, tools, trade-ins, repairs, accessories, accessions, modifications, and replacements, whether now owned or subsequently acquired, constructed, or attached or added to, or placed in, the foregoing, wherever located;

(b)     All inventory wherever located (including in transit), including, but not limited to, goods, merchandise and other personal property, held for sale or lease or furnished or to be furnished under a contract of service, or constituting raw materials, work in process, or materials used or consumed in the Debtor's business, or consigned to others or held by others for return to the Debtor, whether now owned or subsequently acquired or manufactured and wherever located;

(c)     All accounts, accounts receivable, revenues, guest fees and receipts, demand deposits, deposit accounts, "cash collateral" (as defined in 11 U.S.C. Section 363(a), letter-of-

credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property and supporting obligations, contracts, contract rights, notes, bills, drafts, chattel paper (whether tangible or electronic), acceptances, chooses in action, instruments, tax refunds, insurance claims and proceeds, health-care-insurance receivables and all other debts, obligations, and liabilities in whatever form, owing to the Debtor from any person or entity, rights of the Debtor, earned or to be earned, under contracts to sell goods or render services, all of which now belong, have belonged, or will belong to the Debtor for goods sold by it or for services rendered by it, together with all guaranties and securities therefor, all right, title and interest of the Debtor in the merchandise giving rise thereto, including the right of stoppage in transit, and all goods subsequently acquired by the Debtor by way of substitution, replacement, return, repossession or otherwise;

(d)     All general intangibles, including, but not limited to, all payment intangibles, leases and rents, corporate names, trade names, trademarks, trademark applications, trade secrets, patents, patent applications, copyrights, copyright applications, service marks, goodwill, books and records, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, all corporate ledgers and all licenses, permits and agreements of any kind or nature pursuant to which the Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible);

(e)     All of the Debtor's rights in leases of any nature or kind of property owned or leased by or to the Debtor;

(f)     Any and all additions, accessions, substitutions or replacements to or for any of the foregoing;

(g)     Any and all products and proceeds of any or all of the foregoing, including, without limitation, cash, cash equivalents, tax refunds and the proceeds of insurance policies providing coverage against the loss or destruction of or damage to any of the Collateral;

(h)     All of the Debtor's after-acquired property of the kinds and types described in paragraphs (a)-(g) herein; and

(i)     All records and data relating to any of the property described above, whether in the form of a writing, photograph, microfile, microfiche, or electronic media, together with all of the Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any of such records or data or electronic media.

The purpose of this Security Agreement is to make the Secured Party a secured party and provide it with a continuing security interest under the Uniform Commercial Code of the State of New Hampshire in property of the Debtor, as more particularly described above.

Notwithstanding any language contained herein to the contrary, the Secured Party hereby acknowledges that the lien interest described herein is or shall be junior only to a first lien interest in favor of Secured Party in all inventory and accounts, now or hereafter existing, of the

Debtor which serves as collateral for a certain $200,000.00 loan from Secured Party in favor of Debtor.

2.    Secured Obligations.    The security interest granted herein shall secure the following (the "Secured Obligations"):

(a)    The Borrower's payment and performance of a certain loan in the principal amount of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) to the Borrower by the Secured Party pursuant to the Loan Agreement and evidenced by the Note described above.

(b)    The payment of all other sums with interest and charges thereon advanced in accordance herewith to protect the validity, security and priority of this Security Agreement;

(c)    The Debtor's payment or other performance of its obligations under the Loan Agreement, Note evidencing the Loan, this Security Agreement and any and all other loan documents and instruments described in and contemplated thereby (collectively, the "Loan Documents") as the same may be amended, modified, extended, renewed, replaced or restated; and

(d)    Any and all other indebtedness or obligations of the Debtor to the Secured Party whether now or hereafter existing including without limitation, all obligations and liabilities of the Debtor to the Secured Party under any foreign exchange contracts, interest rate swap, cap, floor or hedging agreement or similar agreements and all obligations of the Debtor to the Secured Party arising out of or in connection with any Automated Clearing House ("ACH") Agreements relating to the processing of ACH transactions, together with all fees, expenses, charges and other amounts owing by or chargeable to Debtor under the ACH Agreements.

The Debtor agrees that the Collateral granted to the Secured Party pursuant to this Security Agreement shall, in addition to securing any Loan, advance or indebtedness which may be made contemporaneously with the execution of the Loan Agreement, also secures all future advances, loans, liabilities, and extensions of credit of every nature made by the Secured Party and indebtedness of the Debtor to the Secured Party pursuant to the Loan Agreement or otherwise.

3.    Warranties and Representations of the Debtor.    The Debtor warrants and represents to the Secured Party as follows (which shall survive the execution and delivery of this Agreement and shall be continuing warranties and representations as long as any Secured Obligations remain outstanding):

(a)    Each representation or warranty made in the Loan Documents relating to the Debtor, the Collateral or the security furnished hereunder is true, accurate and complete in all material respects.

(b)    No authorization, approval or other action by, and no notice to or filing with, any governmental authority or other person is required either (a) for the grant by the Debtor of the security interests granted hereby or for the execution, delivery or performance of this Security

Agreement by the Debtor or (b) for the perfection of or the exercise by the Secured Party of their respective rights and remedies hereunder, except the filing of financing statements and the notation of liens on certificates of title.

(c)     The Debtor has not performed any acts which might prevent the Secured Party from enforcing any of the terms and conditions of this Security Agreement or which would limit any of them in any such enforcement.

(d)     The Collateral is and, if acquired hereafter, will be, lawfully owned by the Debtor, free and clear of all other liens, encumbrances and security interests, except as may be disclosed to the Secured Party on Exhibit A hereto, and the Debtor will warrant and defend title to the same against the claims and demands of all persons.

(e)     The Debtor has delivered to the Secured Party a certificate signed by the Debtor and entitled "Perfection Certificate" (the "Perfection Certificate"), a completed copy of which is attached as Exhibit B hereto. The Debtor represents and warrants to the Secured Party as follows: (i) the Debtor's exact legal name is that indicated on the Perfection Certificate and on the signature page thereof, (ii) the Debtor is an organization of the type and organized in the jurisdiction set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth the Debtor's organizational identification number or accurately states that the Debtor has none, (iv) the Perfection Certificate accurately sets forth the Debtor's place of business or, if more than one, its chief executive office as well as the Debtor's mailing address if different; (v) the Debtor conducts business only under and through the business and trade names set forth in the Perfection Certificate; and (vi) all other information set forth on the Perfection Certificate pertaining to the Debtor is accurate and complete.

4.     <u>Affirmative Covenants of the Debtor</u>.  (a) The Debtor shall promptly notify and provide the Secured Party with a complete description of the opening of any new places of business, the closing of any existing places of business, the conduct of business under any names or through any entities other than those set forth herein, the relocation of any of the Collateral to any new place of business, which would affect the financing statements filed by the Secured Party.  The Debtor will furnish to the Secured Party from time to time such statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral, as such Secured Party may reasonably request, all in reasonable detail.

(b)     The Debtor shall continuously take all steps that are necessary or prudent to protect the security interests of the Secured Party in the Collateral.

(c)     The Debtor shall defend the Collateral against the claims and demands of all persons.

(d)     The Debtor shall deliver and pledge to the Secured Party, endorsed or accompanied by instruments of assignment or transfer satisfactory to the Secured Party, any instruments, documents and chattel paper which the Secured Party may specify.

(e)     The Debtor shall keep and maintain the Collateral in good condition and repair and adequately insured (as provided in the Loan Documents) and permit the Secured Party and its agents to inspect the Collateral at any reasonable time.  The Debtor shall be permitted to make normal replacement of its fixed assets.

(f)     The Debtor shall comply, in all material respects, with all governmental regulations applicable to the Collateral or any part thereof or to the operation of the Debtor's business; provided, however, that the Debtor may contest any governmental regulation in any reasonable manner which shall not, in the reasonable opinion of the Secured Party, adversely affect the Secured Party's rights or the priority of its security interest in the Collateral.

(g)     The Debtor shall pay promptly when due all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of its income or profits therefrom, as well as all claims of any kind, except that no such charge need be paid if (i) the validity thereof is being contested in good faith by appropriate proceedings, (ii) such proceedings do not involve any danger of the sale, forfeiture or loss of any of the Collateral or any interest therein; and (iii) such charge is adequately reserved against in accordance with the generally accepted accounting principles.

(h)     The Debtor shall advise the Secured Party promptly, in reasonable detail, (i) of any lien, security interest, encumbrance or claim made or asserted against any of the Collateral, (ii) of any material change, substantial loss or depreciation in the composition of the Collateral, (iii) of the occurrence of any other material adverse effect on the aggregate value, enforceability or collectability of the Collateral or on the security interests created hereunder, and (iv) a default on any lease agreement between Debtor and a third party landlord related to any location at which the Collateral may be stored or maintained.

(i)     The Debtor shall give, execute, deliver and file or record in the proper governmental offices, any instrument, paper or document including, but not limited to, one or more financing statements under the Uniform Commercial Code, satisfactory to the Secured Party, or take any action which the Secured Party may deem necessary or desirable in order to create, preserve, perfect, extend, continue, modify, terminate or otherwise effect any security interest granted pursuant hereto, or to enable the Secured Party to exercise or enforce any of its rights hereunder including, without limitation, upon the occurrence of an Event of a Default, the establishment of one or more lockbox accounts with the Secured Party or others who are, and in a manner which is, satisfactory to the Secured Party.

(j)     The Debtor shall have the possession of the Collateral, except where expressly otherwise provided in this Security Agreement or where Secured Party chooses to perfect its security interest by possession in addition to the filing of a financing statement.  Where the Collateral is in the possession of a third party, the Debtor will join with the Secured Party in notifying the third party of the Secured Party's security interest and obtaining an acknowledgment in an authenticated record from the third party that it is holding the Collateral for the benefit of the Secured Party.

(k)     The Debtor will cooperate with the Secured Party in obtaining control with respect to the Collateral consisting of deposit accounts, investment property, letter-of-credit rights and electronic chattel paper.

(l)     The Debtor will not create any chattel paper without placing a legend on the chattel paper acceptable to the Secured Party indicating that Secured party has a security interest in the chattel paper.

(m)     The Debtor shall pay, or reimburse the Secured Party, in the amount of all expenses (including reasonable fees and expenses of attorneys, experts and agents) incurred in any way in connection with the exercise, defense or assertion of any of its rights or interests hereunder, the enforcement of any provisions hereof or the management, preservation, use, operation, maintenance, collection, possession, disposition or enforcement of any of the Collateral (all such expenses shall be treated as Secured Obligations hereunder).

(n)     Upon any failure of the Debtor to comply with its obligations above, the Secured Party may, at its option, and without affecting any of its other rights or remedies herein or as a secured party under the Uniform Commercial Code, procure the insurance protection it deems necessary and/or cause repairs or modifications to be made to the Collateral, the cost of either or both of which shall be a lien against the Collateral added to the amount of the indebtedness secured hereby and payable on demand with interest at a per annum rate computed on the same basis as the Secured Obligations.

(o)     The Debtor hereby assigns to the Secured Party any and all moneys which may become due and payable under any policy insuring the Collateral, including return of unearned premiums, and directs any such insurance company to make payment directly to the Secured Party, and authorizes the Secured Party to apply such moneys in payment on account of the indebtedness secured hereby, whether or not due, or, at the sole option of the Secured Party, toward replacement of the Collateral, and to remit any surplus to the Debtor.

(p)     The Debtor covenants with the Secured Party as follows: (i) without providing at least thirty (30) days prior written notice to the Secured Party, the Debtor will not change its name, its place of business or, if more than one, its chief executive office, or its mailing address or organizational identification number if it has one, (ii) if the Debtor does not have an organizational identification number and later obtains one, the Debtor shall forthwith notify the Secured Party of such organizational identification number, and (iii) the Debtor will not change its type of organization or jurisdiction of organization or the state where it is located without providing at least thirty (30) days prior written notice to the Secured Party.

5.     Negative Covenants of the Debtor.   Except as otherwise provided in the Loan Agreement, without the prior written consent of the Secured Party, the Debtor shall not:

(a)     Allow or permit any other security interest or lien to attach to any of the Collateral.

(b)     File, or authorize or permit to be filed, in any jurisdiction any financing statement relating to any of the Collateral unless the Secured Party is named as sole secured party, except those interests already filed and listed on Exhibit B.

(c)     Permit any of the Collateral to be levied upon under any legal process.

(d)     Permit anything to be done that may materially impair the value of any of the Collateral or the security therein intended to be afforded hereby.

(e)     Make any sales or leases of any of the Collateral, license any of the Collateral, or grant any other security interest in any of the Collateral.

6.     Events of Default.  The Debtor shall be in default under this Security Agreement upon the occurrence of an event of default under any Loan Document, including the Loan Agreement (herein called "Events of Default").  Such Events of Default shall include, without limitation, the following:

(a)     Default in the due and punctual payment of any payment of principal of or premium, if any, or interest on the Note; and such default shall continue beyond the expiration of the applicable period of grace, if any; or

(b)     Default in payment or performance under any of the Secured Obligations, including, without limitation, the Loan Documents, and such default shall continue beyond the expiration of the applicable period of grace, if any; or

(c)     Default in the due performance or observance of any covenant or provision of this Security Agreement and such default shall continue beyond the expiration of the applicable period of grace, if any.

7.     Rights of Secured Party on Default.  Upon the occurrence of any Event of Default, the Secured Party may declare all of the Secured Obligations to be immediately due and payable and shall then have the remedies of a secured party under the Uniform Commercial Code or under any other applicable law, including, without limitation, the right to take possession of the Collateral, and in addition thereto, the right to enter upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom.  The Secured Party may require the Debtor to make the Collateral (to the extent the same is moveable) available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to all parties.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor at least ten (10) days prior written notice by registered or certified mail at the address of the Debtor set forth above (or at such other address or addresses as the Debtor shall specify in writing to the Secured Party) of the time and place of any public sale thereof or of the place and time after which any private sale or any other intended disposition thereof is to be made.  Any such notice shall be deemed to meet any requirement hereunder or under any applicable law (including the Uniform Commercial Code) that reasonable notification be given of the time and place of such sale or other disposition.  After deducting all costs and expenses of

collection, storage, custody, sale or other disposition and delivery (including reasonable legal costs and attorneys' fees) and all other charges against the Collateral, the residue of the proceeds of any such sale or disposition shall be applied to the payment of the Secured Obligations in such order of priority as the Secured Party shall determine or held in escrow to apply to any contingent obligations of the Debtor to the Secured Party, as required, and any surplus shall be returned to the Debtor. In the event the proceeds of any sale, lease or other disposition of the Collateral hereunder are insufficient to pay all of the Secured Obligations in full, the Debtor will be liable for the deficiency, together with interest thereon, at the maximum rate provided in the Note and the cost and expenses of collection of such deficiency, including (to the extent permitted by law), without limitation, reasonable attorneys' fees, expenses and disbursements.

8. <u>Rights of the Secured Party to Use and Operate Collateral, etc.</u> Upon the occurrence of any Event of Default, but subject to the provisions of the Uniform Commercial Code or other applicable law, the Secured Party shall have the right and power to take possession of all or any part of the Collateral, and to exclude the Debtor and all persons claiming under the Debtor wholly or partly therefrom, and thereafter to hold, store, and/or use, operate, manage and control the same. Upon any such taking of possession, the Secured Party may, from time to time, at the expense of the Debtor, make all such repairs, replacements, alterations, additions and improvements to and of the Collateral as the Secured Party may deem proper. In any such case, subject as aforesaid, the Secured Party shall have the right to manage and control the Collateral and to carry on the business and to exercise all rights and powers of the Debtor in respect thereto as the Secured Party shall deem best, including the right to enter into any and all such agreements with respect to the leasing and/or operation of the Collateral or any part thereof as the Secured Party may see fit; and the Secured Party shall be entitled, subject to the rights of prior lienholders, to collect and receive all rents, issues, profits, fees, revenues and other income of the same and every part thereof. Such rents, issues, profits, fees, revenues and other income shall be applied to pay the expenses of holding and operating the Collateral and of conducting the business thereof, and of all maintenance, repairs, replacements, alterations, additions and improvements, and to make all payments which the Secured Party may be required or may elect to make, if any, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments which the Secured Party may be required or authorized to make under any provision of this Security Agreement (including, but not limited to, legal costs and attorneys' fees). The remainder of such rents, issues, profits, fees, revenues and other income shall be applied to the payment of the Secured Obligations in such order of priority as the Secured Party shall determine and any surplus shall be returned to the Debtor. Without limiting the generality of the foregoing, the Secured Party shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by the Secured Party to enforce its rights and remedies hereunder in order to manage, protect and preserve the Collateral and continue the operation of the business of the Debtor and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payment of the Secured Obligations as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated.

9. <u>Right of Setoff</u>. Debtor hereby grants to Secured Party, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Secured Party, whether

now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Secured Party or any entity under the control of Monadnock Community Bank and its successors and assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by Debtor), Secured Party may setoff the same or any part thereof and apply the same to any liability or obligation of Debtor and any guarantor of the Loan even though unmatured and regardless of the adequacy of any other collateral securing the Loan. ANY AND ALL RIGHTS TO REQUIRE SECURED PARTY TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF DEBTOR OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

10.     Collection of Accounts Receivable, etc.  Upon the occurrence of any Event of Default, the Secured Party may notify or may require the Debtor to notify account debtors obligated on any or all of the Debtor's accounts receivable, whether now existing or hereafter arising, to make payment directly to the Secured Party, and may take possession of all proceeds of any accounts in the Debtor's possession, and may take any other steps which the Secured Party deem necessary or advisable to collect any or all accounts receivable or other Collateral or proceeds thereof.

11.     Authorization to File Financing Statements.  The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) accurately describe the Collateral, and (b) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon request. The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

12.     Waiver, etc.  The Debtor hereby waives presentment, demand, notice, protest and, except as is otherwise provided herein, all other demands and notices in connection with this Security Agreement or the enforcement of the Secured Party's rights hereunder or in connection with any Secured Obligations or any Collateral; consents to and waives notice of the granting of renewals, extensions of time for payment or other indulgences to the Debtor or to any account debtor in respect of any account receivable, or substitution, release or surrender of any Collateral, the addition or release of persons primarily or secondarily liable on any Secured Obligation or on any account receivable or other Collateral, the acceptance of partial payments on any Secured Obligation or on any account receivable or other Collateral and/or the settlement or compromise thereof. No delay or omission on the part of the Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder. Any

waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any such future occasion.

THE DEBTOR AND THE SECURED PARTY MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF SECURED PARTY RELATING TO THE ADMINISTRATION OF THE LOANS OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, THE DEBTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, ENHANCED COMPENSATORY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE DEBTOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF SECURED PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR SECURED PARTY TO ACCEPT THIS AGREEMENT AND MAKE THE LOAN.

13. **Termination; Assignments, etc.** This Agreement and the security interest in the Collateral created hereby shall be terminated when all of the Secured Obligations have been (a) fully and finally paid and performed and (b) delivery of a final discharge in writing by the Secured Party (this Agreement and such security interest shall continue in full force and effect notwithstanding any temporary payment of the Secured Obligations under a revolving credit instrument). In the event of a sale or assignment by the Secured Party of all or any of the Secured Obligations held by it, the Secured Party may assign or transfer its rights and interests under this Security Agreement in whole or in part to the purchaser or purchasers of such Secured Obligations, whereupon such purchaser or purchasers shall become vested with all of the powers and rights of the Secured Party hereunder, and the Secured Party shall thereafter be forever released and fully discharged from any liability or responsibility hereunder, with respect to the rights and interests so assigned.

14. **Notices.** Except as otherwise provided herein, notice to the Debtor or to the Secured Party shall be deemed to have been sufficiently given or served for all purposes hereof if mailed, certified or registered mail, return receipt requested, postage prepaid to the parties at the addresses set forth above in this Security Agreement or at such other address as the party to whom such notice is directed may have designated in writing to the other parties hereto.

15. **Miscellaneous.** (a) The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the

accounting for monies actually received by it hereunder, the Secured Party shall not have any duty as to any Collateral or as to the taking of any necessary steps to preserve any right of it or of the Debtor against other parties pertaining to any Collateral.

(b) No provision hereof shall be amended except by a writing signed by the Secured Party and the Debtor.

(c) Any provision of this Security Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

(d) This Security Agreement shall be binding upon and shall inure to the benefit of the assigns and successors of the Secured Party and the Debtor.

(e) No delay, failure to enforce, or single or partial exercise on the part of the Secured Party in connection with any of its rights hereunder shall constitute an estoppel or waiver thereof, or preclude other or further exercises or enforcement thereof and no waiver of any default hereunder shall be a waiver of any subsequent default.

(f) This Agreement and the rights and obligations of the parties hereunder shall be construed and their provisions interpreted under and in accordance with the laws of the State of New Hampshire (excluding the laws applicable to conflicts or choice of law). The Debtor, to the extent it may legally do so, hereby consents to the jurisdiction of the courts of the State of New Hampshire and the United States District Court for the State of New Hampshire, as well as to the jurisdiction of all courts from which an appeal may be taken from such courts for the purpose of any suit, action or other proceeding arising out of any of their obligations hereunder or with respect to the transactions contemplated hereby, and expressly waive any and all objections they may have to venue in any such courts.

(g) Upon receipt of an affidavit of an officer of Secured Party as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or other security document, Debtor will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

(h) The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

i) When SBA is the holder of the Note in favor of SBA, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

ii) Granite State Development Corporation (GSEDC) or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not

waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

IN WITNESS WHEREOF, acting by and through its duly authorized agent, the parties hereto have executed this Security Agreement on the day and year first hereinbefore stated.

THE PCL GROUP, LLC

_____
Witness

By: _____ Steven L. Lawrence
Its: Manager
Duly Authorized

**MONADNOCK COMMUNITY BANK**

_____
Witness

By: William C. Gilson
Its: Senior Vice President
Duly Authorized

**STATE OF NEW HAMPSHIRE**
**COUNTY OF HILLSBOROUGH**

On this 19th day of August, 2009, personally appeared Steven L. Lawrence, in his capacity as Manager of The PCL Group, LLC, known to me, or satisfactorily proven, to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained, as his free act and deed, and in the aforementioned capacity.

Before me,

_____
Justice of the Peace/Notary Public
My commission expires:_____



## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Griffin & Owen, P.C.
Spruce Park Professional Center
109 Ponemah Road #5
Amherst, NH 03031

*EXHIBIT E*

State of New Hampshire
UCC1 Initial Filing 2 Page(s)

T0923106020

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The PCL Group, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 375 Jaffrey Road | Peterborough | NH | 03458 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Ltd. Liability Co. | NH | | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only <u>one</u> secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Monadnock Community Bank | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| One Jaffrey Road | Peterborough | NH | 03458 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Exhibit A attached hereto.

**5. ALTERNATIVE DESIGNATION** [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**6.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] **7.** Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**

## EXHIBIT A

**Debtor:**    **The PCL Group, LLC**
**Secured Party:**  **Monadnock Community Bank**

(a) All goods, including, but not limited to, machinery, equipment, furniture, appliances, fixtures, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, along with all other parts, tools, trade-ins, repairs, accessories, accessions, modifications, and replacements, whether now owned or subsequently acquired, constructed, or attached or added to, or placed in, the foregoing, wherever located;

(b) All inventory wherever located (including in transit), including, but not limited to, goods, merchandise and other personal property, held for sale or lease or furnished or to be furnished under a contract of service, or constituting raw materials, work in process, or materials used or consumed in the Debtor's business, or consigned to others or held by others for return to the Debtor, whether now owned or subsequently acquired or manufactured and wherever located;

(c) All accounts, accounts receivable, revenues, guest fees and receipts, demand deposits, deposit accounts, "cash collateral" (as defined in 11 U.S.C. Section 363(a), letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property and supporting obligations, contracts, contract rights, notes, bills, drafts, chattel paper (whether tangible or electronic), acceptances, chooses in action, instruments, tax refunds, insurance claims and proceeds, health-care-insurance receivables and all other debts, obligations, and liabilities in whatever form, owing to the Debtor from any person or entity, rights of the Debtor, earned or to be earned, under contracts to sell goods or render services, all of which now belong, have belonged, or will belong to the Debtor for goods sold by it or for services rendered by it, together with all guaranties and securities therefor, all right, title and interest of the Debtor in the merchandise giving rise thereto, including the right of stoppage in transit, and all goods subsequently acquired by the Debtor by way of substitution, replacement, return, repossession or otherwise;

(d) All general intangibles, including, but not limited to, all payment intangibles, leases and rents, corporate names, trade names, trademarks, trademark applications, trade secrets, patents, patent applications, copyrights, copyright applications, service marks, goodwill, books and records, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, all corporate ledgers and all licenses, permits and agreements of any kind or nature pursuant to which the Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible);

(e) All of the Debtor's rights in leases of any nature or kind of property owned or leased by or to the Debtor;

(f) Any and all additions, accessions, substitutions or replacements to or for any of the foregoing;

(g) Any and all products and proceeds of any or all of the foregoing, including, without limitation, cash, cash equivalents, tax refunds and the proceeds of insurance policies providing coverage against the loss or destruction of or damage to any of the Collateral;

(h) All of the Debtor's after-acquired property of the kinds and types described in paragraphs (a)-(g) herein; and

(i) All records and data relating to any of the property described above, whether in the form of a writing, photograph, microfile, microfiche, or electronic media, together with all of the Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any of such records or data or electronic media.

1

# SECURITY AGREEMENT

SECURITY AGREEMENT dated as of this 19th day of August, 2009, by and between **THE PCL GROUP, LLC**, a New Hampshire limited liability company, with a mailing address of 375 Jaffrey Road, Peterborough, New Hampshire (the "Debtor"), and **MONADNOCK COMMUNITY BANK**, a banking corporation organized and existing under the laws of the United States of America, with its principal office at One Jaffrey Road, PO Box 888, Peterborough, New Hampshire, or its successors and assigns (the "Secured Party").

## WITNESSETH:

WHEREAS, incident to a certain Promissory Note from the Debtor in favor of Secured Party in the initial principal amount of $200,000.00 ("Note"), the Secured Party may make loans and financial accommodations to Borrower (collectively, the "Loan"), all as set forth in the Loan Agreement; and

WHEREAS, the obligations of the Secured Party to make the Loan to Borrower are subject to the condition, among others, that the Debtor shall execute and deliver this Agreement and grant the security interests hereinafter described;

NOW, THEREFORE, in consideration of the willingness of the Secured Party to make the Loan to the Debtor and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Security Interest. As security for the Secured Obligations described in Section 2 hereof, the Debtor hereby grants to the Secured Party a security interest in and lien on all of the property described below, as such terms may be defined pursuant to Revised Article 9 of the Uniform Commercial Code ("UCC"), as revised pursuant to the 2000 Official Text of the UCC, as enacted in the State of New Hampshire (hereinafter referred to collectively as the "Collateral"):

(a)    All goods, including, but not limited to, machinery, equipment, furniture, appliances, fixtures, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, along with all other parts, tools, trade-ins, repairs, accessories, accessions, modifications, and replacements, whether now owned or subsequently acquired, constructed, or attached or added to, or placed in, the foregoing, wherever located;

(b)    All inventory wherever located (including in transit), including, but not limited to, goods, merchandise and other personal property, held for sale or lease or furnished or to be furnished under a contract of service, or constituting raw materials, work in process, or materials used or consumed in the Debtor's business, or consigned to others or held by others for return to the Debtor, whether now owned or subsequently acquired or manufactured and wherever located;

(c)    All accounts, accounts receivable, revenues, guest fees and receipts, demand deposits, deposit accounts, "cash collateral" (as defined in 11 U.S.C. Section 363(a), letter-of-

credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property and supporting obligations, contracts, contract rights, notes, bills, drafts, chattel paper (whether tangible or electronic), acceptances, chooses in action, instruments, tax refunds, insurance claims and proceeds, health-care-insurance receivables and all other debts, obligations, and liabilities in whatever form, owing to the Debtor from any person or entity, rights of the Debtor, earned or to be earned, under contracts to sell goods or render services, all of which now belong, have belonged, or will belong to the Debtor for goods sold by it or for services rendered by it, together with all guaranties and securities therefor, all right, title and interest of the Debtor in the merchandise giving rise thereto, including the right of stoppage in transit, and all goods subsequently acquired by the Debtor by way of substitution, replacement, return, repossession or otherwise;

(d)     All general intangibles, including, but not limited to, all payment intangibles, leases and rents, corporate names, trade names, trademarks, trademark applications, trade secrets, patents, patent applications, copyrights, copyright applications, service marks, goodwill, books and records, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, all corporate ledgers and all licenses, permits and agreements of any kind or nature pursuant to which the Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible);

(e)     All of the Debtor's rights in leases of any nature or kind of property owned or leased by or to the Debtor;

(f)     Any and all additions, accessions, substitutions or replacements to or for any of the foregoing;

(g)     Any and all products and proceeds of any or all of the foregoing, including, without limitation, cash, cash equivalents, tax refunds and the proceeds of insurance policies providing coverage against the loss or destruction of or damage to any of the Collateral;

(h)     All of the Debtor's after-acquired property of the kinds and types described in paragraphs (a)-(g) herein; and

(i)     All records and data relating to any of the property described above, whether in the form of a writing, photograph, microfile, microfiche, or electronic media, together with all of the Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any of such records or data or electronic media.

The purpose of this Security Agreement is to make the Secured Party a secured party and provide it with a continuing security interest under the Uniform Commercial Code of the State of New Hampshire in property of the Debtor, as more particularly described above.

Notwithstanding any language contained herein to the contrary, the Secured Party hereby acknowledges that the lien interest described herein is or shall be junior only to a first lien interest in favor of Secured Party in all equipment, fixtures, instruments, chattel paper and

general intangibles, now or hereafter existing, of the Debtor which serves as collateral for a certain $750,000.00 loan from Secured Party in favor of Debtor.

2.  Secured Obligations.  The security interest granted herein shall secure the following (the "Secured Obligations"):

(a)  The Borrower's payment and performance of a certain loan in the principal amount of Two Hundred Thousand and No/100 Dollars ($200,000.00) to the Borrower by the Secured Party pursuant to the Loan Agreement and evidenced by the Note described above.

(b)  The payment of all other sums with interest and charges thereon advanced in accordance herewith to protect the validity, security and priority of this Security Agreement;

(c)  The Debtor's payment or other performance of its obligations under the Loan Agreement, Note evidencing the Loan, this Security Agreement and any and all other loan documents and instruments described in and contemplated thereby (collectively, the "Loan Documents") as the same may be amended, modified, extended, renewed, replaced or restated; and

(d)  Any and all other indebtedness or obligations of the Debtor to the Secured Party whether now or hereafter existing including without limitation, all obligations and liabilities of the Debtor to the Secured Party under any foreign exchange contracts, interest rate swap, cap, floor or hedging agreement or similar agreements and all obligations of the Debtor to the Secured Party arising out of or in connection with any Automated Clearing House ("ACH") Agreements relating to the processing of ACH transactions, together with all fees, expenses, charges and other amounts owing by or chargeable to Debtor under the ACH Agreements.

The Debtor agrees that the Collateral granted to the Secured Party pursuant to this Security Agreement shall, in addition to securing any Loan, advance or indebtedness which may be made contemporaneously with the execution of the Loan Agreement, also secures all future advances, loans, liabilities, and extensions of credit of every nature made by the Secured Party and indebtedness of the Debtor to the Secured Party pursuant to the Loan Agreement or otherwise.

3.  Warranties and Representations of the Debtor.  The Debtor warrants and represents to the Secured Party as follows (which shall survive the execution and delivery of this Agreement and shall be continuing warranties and representations as long as any Secured Obligations remain outstanding):

(a)  Each representation or warranty made in the Loan Documents relating to the Debtor, the Collateral or the security furnished hereunder is true, accurate and complete in all material respects.

(b)  No authorization, approval or other action by, and no notice to or filing with, any governmental authority or other person is required either (a) for the grant by the Debtor of the security interests granted hereby or for the execution, delivery or performance of this Security

Agreement by the Debtor or (b) for the perfection of or the exercise by the Secured Party of their respective rights and remedies hereunder, except the filing of financing statements and the notation of liens on certificates of title.

(c)     The Debtor has not performed any acts which might prevent the Secured Party from enforcing any of the terms and conditions of this Security Agreement or which would limit any of them in any such enforcement.

(d)     The Collateral is and, if acquired hereafter, will be, lawfully owned by the Debtor, free and clear of all other liens, encumbrances and security interests, except as may be disclosed to the Secured Party on Exhibit A hereto, and the Debtor will warrant and defend title to the same against the claims and demands of all persons.

(e)     The Debtor has delivered to the Secured Party a certificate signed by the Debtor and entitled "Perfection Certificate" (the "Perfection Certificate"), a completed copy of which is attached as Exhibit B hereto.  The Debtor represents and warrants to the Secured Party as follows: (i) the Debtor's exact legal name is that indicated on the Perfection Certificate and on the signature page thereof, (ii) the Debtor is an organization of the type and organized in the jurisdiction set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth the Debtor's organizational identification number or accurately states that the Debtor has none, (iv) the Perfection Certificate accurately sets forth the Debtor's place of business or, if more than one, its chief executive office as well as the Debtor's mailing address if different; (v) the Debtor conducts business only under and through the business and trade names set forth in the Perfection Certificate; and (vi) all other information set forth on the Perfection Certificate pertaining to the Debtor is accurate and complete.

4.     <u>Affirmative Covenants of the Debtor</u>.  (a) The Debtor shall promptly notify and provide the Secured Party with a complete description of the opening of any new places of business, the closing of any existing places of business, the conduct of business under any names or through any entities other than those set forth herein, the relocation of any of the Collateral to any new place of business, which would affect the financing statements filed by the Secured Party.  The Debtor will furnish to the Secured Party from time to time such statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral, as such Secured Party may reasonably request, all in reasonable detail.

(b)     The Debtor shall continuously take all steps that are necessary or prudent to protect the security interests of the Secured Party in the Collateral.

(c)     The Debtor shall defend the Collateral against the claims and demands of all persons.

(d)     The Debtor shall deliver and pledge to the Secured Party, endorsed or accompanied by instruments of assignment or transfer satisfactory to the Secured Party, any instruments, documents and chattel paper which the Secured Party may specify.

(e)     The Debtor shall keep and maintain the Collateral in good condition and repair and adequately insured (as provided in the Loan Documents) and permit the Secured Party and its agents to inspect the Collateral at any reasonable time.  The Debtor shall be permitted to make normal replacement of its fixed assets.

(f)     The Debtor shall comply, in all material respects, with all governmental regulations applicable to the Collateral or any part thereof or to the operation of the Debtor's business; provided, however, that the Debtor may contest any governmental regulation in any reasonable manner which shall not, in the reasonable opinion of the Secured Party, adversely affect the Secured Party's rights or the priority of its security interest in the Collateral.

(g)     The Debtor shall pay promptly when due all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of its income or profits therefrom, as well as all claims of any kind, except that no such charge need be paid if (i) the validity thereof is being contested in good faith by appropriate proceedings, (ii) such proceedings do not involve any danger of the sale, forfeiture or loss of any of the Collateral or any interest therein; and (iii) such charge is adequately reserved against in accordance with the generally accepted accounting principles.

(h)     The Debtor shall advise the Secured Party promptly, in reasonable detail, (i) of any lien, security interest, encumbrance or claim made or asserted against any of the Collateral, (ii) of any material change, substantial loss or depreciation in the composition of the Collateral, (iii) of the occurrence of any other material adverse effect on the aggregate value, enforceability or collectability of the Collateral or on the security interests created hereunder, and (iv) a default on any lease agreement between Debtor and a third party landlord related to any location at which the Collateral may be stored or maintained.

(i)     The Debtor shall give, execute, deliver and file or record in the proper governmental offices, any instrument, paper or document including, but not limited to, one or more financing statements under the Uniform Commercial Code, satisfactory to the Secured Party, or take any action which the Secured Party may deem necessary or desirable in order to create, preserve, perfect, extend, continue, modify, terminate or otherwise effect any security interest granted pursuant hereto, or to enable the Secured Party to exercise or enforce any of its rights hereunder including, without limitation, upon the occurrence of an Event of a Default, the establishment of one or more lockbox accounts with the Secured Party or others who are, and in a manner which is, satisfactory to the Secured Party.

(j)     The Debtor shall have the possession of the Collateral, except where expressly otherwise provided in this Security Agreement or where Secured Party chooses to perfect its security interest by possession in addition to the filing of a financing statement.  Where the Collateral is in the possession of a third party, the Debtor will join with the Secured Party in notifying the third party of the Secured Party's security interest and obtaining an acknowledgment in an authenticated record from the third party that it is holding the Collateral for the benefit of the Secured Party.

(k)     The Debtor will cooperate with the Secured Party in obtaining control with respect to the Collateral consisting of deposit accounts, investment property, letter-of-credit rights and electronic chattel paper.

(l)     The Debtor will not create any chattel paper without placing a legend on the chattel paper acceptable to the Secured Party indicating that Secured party has a security interest in the chattel paper.

(m)     The Debtor shall pay, or reimburse the Secured Party, in the amount of all expenses (including reasonable fees and expenses of attorneys, experts and agents) incurred in any way in connection with the exercise, defense or assertion of any of its rights or interests hereunder, the enforcement of any provisions hereof or the management, preservation, use, operation, maintenance, collection, possession, disposition or enforcement of any of the Collateral (all such expenses shall be treated as Secured Obligations hereunder).

(n)     Upon any failure of the Debtor to comply with its obligations above, the Secured Party may, at its option, and without affecting any of its other rights or remedies herein or as a secured party under the Uniform Commercial Code, procure the insurance protection it deems necessary and/or cause repairs or modifications to be made to the Collateral, the cost of either or both of which shall be a lien against the Collateral added to the amount of the indebtedness secured hereby and payable on demand with interest at a per annum rate computed on the same basis as the Secured Obligations.

(o)     The Debtor hereby assigns to the Secured Party any and all moneys which may become due and payable under any policy insuring the Collateral, including return of unearned premiums, and directs any such insurance company to make payment directly to the Secured Party, and authorizes the Secured Party to apply such moneys in payment on account of the indebtedness secured hereby, whether or not due, or, at the sole option of the Secured Party, toward replacement of the Collateral, and to remit any surplus to the Debtor.

(p)     The Debtor covenants with the Secured Party as follows: (i) without providing at least thirty (30) days prior written notice to the Secured Party, the Debtor will not change its name, its place of business or, if more than one, its chief executive office, or its mailing address or organizational identification number if it has one, (ii) if the Debtor does not have an organizational identification number and later obtains one, the Debtor shall forthwith notify the Secured Party of such organizational identification number, and (iii) the Debtor will not change its type of organization or jurisdiction of organization or the state where it is located without providing at least thirty (30) days prior written notice to the Secured Party.

5.     <u>Negative Covenants of the Debtor</u>.  Except as otherwise provided in the Loan Agreement, without the prior written consent of the Secured Party, the Debtor shall not:

(a)     Allow or permit any other security interest or lien to attach to any of the Collateral.

(b)     File, or authorize or permit to be filed, in any jurisdiction any financing statement relating to any of the Collateral unless the Secured Party is named as sole secured party, except those interests already filed and listed on Exhibit B.

(c)     Permit any of the Collateral to be levied upon under any legal process.

(d)     Permit anything to be done that may materially impair the value of any of the Collateral or the security therein intended to be afforded hereby.

(e)     Make any sales or leases of any of the Collateral, license any of the Collateral, or grant any other security interest in any of the Collateral.

6.     Events of Default.  The Debtor shall be in default under this Security Agreement upon the occurrence of an event of default under any Loan Document, including the Loan Agreement (herein called "Events of Default").  Such Events of Default shall include, without limitation, the following:

(a)     Default in the due and punctual payment of any payment of principal of or premium, if any, or interest on the Note; and such default shall continue beyond the expiration of the applicable period of grace, if any; or

(b)     Default in payment or performance under any of the Secured Obligations, including, without limitation, the Loan Documents, and such default shall continue beyond the expiration of the applicable period of grace, if any; or

(c)     Default in the due performance or observance of any covenant or provision of this Security Agreement and such default shall continue beyond the expiration of the applicable period of grace, if any.

7.     Rights of Secured Party on Default.  Upon the occurrence of any Event of Default, the Secured Party may declare all of the Secured Obligations to be immediately due and payable and shall then have the remedies of a secured party under the Uniform Commercial Code or under any other applicable law, including, without limitation, the right to take possession of the Collateral, and in addition thereto, the right to enter upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom.  The Secured Party may require the Debtor to make the Collateral (to the extent the same is moveable) available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to all parties.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor at least ten (10) days prior written notice by registered or certified mail at the address of the Debtor set forth above (or at such other address or addresses as the Debtor shall specify in writing to the Secured Party) of the time and place of any public sale thereof or of the place and time after which any private sale or any other intended disposition thereof is to be made.  Any such notice shall be deemed to meet any requirement hereunder or under any applicable law (including the Uniform Commercial Code) that reasonable notification be given of the time and place of such sale or other disposition.  After deducting all costs and expenses of

collection, storage, custody, sale or other disposition and delivery (including reasonable legal costs and attorneys' fees) and all other charges against the Collateral, the residue of the proceeds of any such sale or disposition shall be applied to the payment of the Secured Obligations in such order of priority as the Secured Party shall determine or held in escrow to apply to any contingent obligations of the Debtor to the Secured Party, as required, and any surplus shall be returned to the Debtor. In the event the proceeds of any sale, lease or other disposition of the Collateral hereunder are insufficient to pay all of the Secured Obligations in full, the Debtor will be liable for the deficiency, together with interest thereon, at the maximum rate provided in the Note and the cost and expenses of collection of such deficiency, including (to the extent permitted by law), without limitation, reasonable attorneys' fees, expenses and disbursements.

8. <u>Rights of the Secured Party to Use and Operate Collateral, etc.</u> Upon the occurrence of any Event of Default, but subject to the provisions of the Uniform Commercial Code or other applicable law, the Secured Party shall have the right and power to take possession of all or any part of the Collateral, and to exclude the Debtor and all persons claiming under the Debtor wholly or partly therefrom, and thereafter to hold, store, and/or use, operate, manage and control the same. Upon any such taking of possession, the Secured Party may, from time to time, at the expense of the Debtor, make all such repairs, replacements, alterations, additions and improvements to and of the Collateral as the Secured Party may deem proper. In any such case, subject as aforesaid, the Secured Party shall have the right to manage and control the Collateral and to carry on the business and to exercise all rights and powers of the Debtor in respect thereto as the Secured Party shall deem best, including the right to enter into any and all such agreements with respect to the leasing and/or operation of the Collateral or any part thereof as the Secured Party may see fit, and the Secured Party shall be entitled, subject to the rights of prior lienholders, to collect and receive all rents, issues, profits, fees, revenues and other income of the same and every part thereof. Such rents, issues, profits, fees, revenues and other income shall be applied to pay the expenses of holding and operating the Collateral and of conducting the business thereof, and of all maintenance, repairs, replacements, alterations, additions and improvements, and to make all payments which the Secured Party may be required or may elect to make, if any, for taxes, assessments, insurance and other charges upon the Collateral or any part thereof, and all other payments which the Secured Party may be required or authorized to make under any provision of this Security Agreement (including, but not limited to, legal costs and attorneys' fees). The remainder of such rents, issues, profits, fees, revenues and other income shall be applied to the payment of the Secured Obligations in such order of priority as the Secured Party shall determine and any surplus shall be returned to the Debtor. Without limiting the generality of the foregoing, the Secured Party shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by the Secured Party to enforce its rights and remedies hereunder in order to manage, protect and preserve the Collateral and continue the operation of the business of the Debtor and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payment of the Secured Obligations as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated.

9. <u>Right of Setoff</u>. Debtor hereby grants to Secured Party, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Secured Party, whether

now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Secured Party or any entity under the control of Monadnock Community Bank and its successors and assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by Debtor), Secured Party may setoff the same or any part thereof and apply the same to any liability or obligation of Debtor and any guarantor of the Loan even though unmatured and regardless of the adequacy of any other collateral securing the Loan. ANY AND ALL RIGHTS TO REQUIRE SECURED PARTY TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF DEBTOR OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

10.　　Collection of Accounts Receivable, etc. Upon the occurrence of any Event of Default, the Secured Party may notify or may require the Debtor to notify account debtors obligated on any or all of the Debtor's accounts receivable, whether now existing or hereafter arising, to make payment directly to the Secured Party, and may take possession of all proceeds of any accounts in the Debtor's possession, and may take any other steps which the Secured Party deem necessary or advisable to collect any or all accounts receivable or other Collateral or proceeds thereof.

11.　　Authorization to File Financing Statements. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) accurately describe the Collateral, and (b) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon request. The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

12.　　Waiver, etc. The Debtor hereby waives presentment, demand, notice, protest and, except as is otherwise provided herein, all other demands and notices in connection with this Security Agreement or the enforcement of the Secured Party's rights hereunder or in connection with any Secured Obligations or any Collateral; consents to and waives notice of the granting of renewals, extensions of time for payment or other indulgences to the Debtor or to any account debtor in respect of any account receivable, or substitution, release or surrender of any Collateral, the addition or release of persons primarily or secondarily liable on any Secured Obligation or on any account receivable or other Collateral, the acceptance of partial payments on any Secured Obligation or on any account receivable or other Collateral and/or the settlement or compromise thereof. No delay or omission on the part of the Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder. Any

waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any such future occasion.

THE DEBTOR AND THE SECURED PARTY MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF SECURED PARTY RELATING TO THE ADMINISTRATION OF THE LOANS OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, THE DEBTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, ENHANCED COMPENSATORY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE DEBTOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF SECURED PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR SECURED PARTY TO ACCEPT THIS AGREEMENT AND MAKE THE LOAN.

13. <u>Termination; Assignments, etc.</u>  This Agreement and the security interest in the Collateral created hereby shall be terminated when all of the Secured Obligations have been (a) fully and finally paid and performed and (b) delivery of a final discharge in writing by the Secured Party (this Agreement and such security interest shall continue in full force and effect notwithstanding any temporary payment of the Secured Obligations under a revolving credit instrument).  In the event of a sale or assignment by the Secured Party of all or any of the Secured Obligations held by it, the Secured Party may assign or transfer its rights and interests under this Security Agreement in whole or in part to the purchaser or purchasers of such Secured Obligations, whereupon such purchaser or purchasers shall become vested with all of the powers and rights of the Secured Party hereunder, and the Secured Party shall thereafter be forever released and fully discharged from any liability or responsibility hereunder, with respect to the rights and interests so assigned.

14. <u>Notices.</u>  Except as otherwise provided herein, notice to the Debtor or to the Secured Party shall be deemed to have been sufficiently given or served for all purposes hereof if mailed, certified or registered mail, return receipt requested, postage prepaid to the parties at the addresses set forth above in this Security Agreement or at such other address as the party to whom such notice is directed may have designated in writing to the other parties hereto.

15. <u>Miscellaneous.</u>  (a) The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the

accounting for monies actually received by it hereunder, the Secured Party shall not have any duty as to any Collateral or as to the taking of any necessary steps to preserve any right of it or of the Debtor against other parties pertaining to any Collateral.

(b)     No provision hereof shall be amended except by a writing signed by the Secured Party and the Debtor.

(c)     Any provision of this Security Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

(d)     This Security Agreement shall be binding upon and shall inure to the benefit of the assigns and successors of the Secured Party and the Debtor.

(e)     No delay, failure to enforce, or single or partial exercise on the part of the Secured Party in connection with any of its rights hereunder shall constitute an estoppel or waiver thereof, or preclude other or further exercises or enforcement thereof and no waiver of any default hereunder shall be a waiver of any subsequent default.

(f)     This Agreement and the rights and obligations of the parties hereunder shall be construed and their provisions interpreted under and in accordance with the laws of the State of New Hampshire (excluding the laws applicable to conflicts or choice of law). The Debtor, to the extent it may legally do so, hereby consents to the jurisdiction of the courts of the State of New Hampshire and the United States District Court for the State of New Hampshire, as well as to the jurisdiction of all courts from which an appeal may be taken from such courts for the purpose of any suit, action or other proceeding arising out of any of their obligations hereunder or with respect to the transactions contemplated hereby, and expressly waive any and all objections they may have to venue in any such courts.

(g)     Upon receipt of an affidavit of an officer of Secured Party as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or other security document, Debtor will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

(h)     The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

i)     When SBA is the holder of the Note in favor of SBA, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

ii)     Granite State Development Corporation (GSEDC) or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not

waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

IN WITNESS WHEREOF, acting by and through its duly authorized agent, the parties hereto have executed this Security Agreement on the day and year first hereinbefore stated.

|  |  |
|---|---|
| Witness | THE PCL GROUP, LLC |
|  | By: Steven L. Lawrence |
|  | Its: Manager |
|  | Duly Authorized |

**MONADNOCK COMMUNITY BANK**

|  |  |
|---|---|
| Witness | By: William C. Gilson |
|  | Its: Senior Vice President |
|  | Duly Authorized |

**STATE OF NEW HAMPSHIRE**
**COUNTY OF HILLSBOROUGH**

On this 19th day of August, 2009, personally appeared Steven L. Lawrence, in his capacity as Manager of The PCL Group, LLC, known to me, or satisfactorily proven, to be the person whose name is subscribed to the foregoing instrument and acknowledged that he executed the same for the purposes therein contained, as his free act and deed, and in the aforementioned capacity.

Before me,

_____
Justice of the Peace/Notary Public
My commission expires:_____



# EXHIBIT A

## Other Liens, Etc.



File Number: 20090016649J
Date Filed: 08/19/2009 04:30 PM
William M. Gardner
Secretary of State

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

EXHIBIT G

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Griffin & Owen, P.C.
Spruce Park Professional Center
109 Ponemah Road #5
Amherst, NH  03031

State of New Hampshire
UCC1 Initial Filing 2 Page(s)

T0923106021

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The PCL Group, LLC | | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 375 Jaffrey Road | Peterborough | NH | 03458 | USA |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Ltd. Liability Co. | NH | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Monadnock Community Bank | | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| One Jaffrey Road | Peterborough | NH | 03458 | USA |

**4.** This FINANCING STATEMENT covers the following collateral:

See Exhibit A attached hereto.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**Debtor:**          **The PCL Group, LLC**

**Secured Party:**     **Monadnock Community Bank**

(a) All goods, including, but not limited to, machinery, equipment, furniture, appliances, fixtures, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, along with all other parts, tools, trade-ins, repairs, accessories, accessions, modifications, and replacements, whether now owned or subsequently acquired, constructed, or attached or added to, or placed in, the foregoing, wherever located;

(b) All inventory wherever located (including in transit), including, but not limited to, goods, merchandise and other personal property, held for sale or lease or furnished or to be furnished under a contract of service, or constituting raw materials, work in process, or materials used or consumed in the Debtor's business, or consigned to others or held by others for return to the Debtor, whether now owned or subsequently acquired or manufactured and wherever located;

(c) All accounts, accounts receivable, revenues, guest fees and receipts, demand deposits, deposit accounts, "cash collateral" (as defined in 11 U.S.C. Section 363(a), letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property and supporting obligations, contracts, contract rights, notes, bills, drafts, chattel paper (whether tangible or electronic), acceptances, chooses in action, instruments, tax refunds, insurance claims and proceeds, health-care-insurance receivables and all other debts, obligations, and liabilities in whatever form, owing to the Debtor from any person or entity, rights of the Debtor, earned or to be earned, under contracts to sell goods or render services, all of which now belong, have belonged, or will belong to the Debtor for goods sold by it or for services rendered by it, together with all guaranties and securities therefor, all right, title and interest of the Debtor in the merchandise giving rise thereto, including the right of stoppage in transit, and all goods subsequently acquired by the Debtor by way of substitution, replacement, return, repossession or otherwise;

(d) All general intangibles, including, but not limited to, all payment intangibles, leases and rents, corporate names, trade names, trademarks, trademark applications, trade secrets, patents, patent applications, copyrights, copyright applications, service marks, goodwill, books and records, customer lists, blue prints and plans, computer programs, tapes and related electronic data processing software, all corporate ledgers and all licenses, permits and agreements of any kind or nature pursuant to which the Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible);

(e) All of the Debtor's rights in leases of any nature or kind of property owned or leased by or to the Debtor;

(f) Any and all additions, accessions, substitutions or replacements to or for any of the foregoing;

(g) Any and all products and proceeds of any or all of the foregoing, including, without limitation, cash, cash equivalents, tax refunds and the proceeds of insurance policies providing coverage against the loss or destruction of or damage to any of the Collateral;·

(h) All of the Debtor's after-acquired property of the kinds and types described in paragraphs (a)-(g) herein; and

(i) All records and data relating to any of the property described above, whether in the form of a writing, photograph, microfile, microfiche, or electronic media, together with all of the Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any of such records or data or electronic media.

1